Flint Memorial Park Association v. Commissioner.
Flint Mem. Park Ass'n v. Commissioner
Docket No. 3965.
United States Tax Court
1946 Tax Ct. Memo LEXIS 177; 5 T.C.M. (CCH) 447; T.C.M. (RIA) 46131; May 29, 1946
William C. Allee, Esq., Penobscot Bldg., Detroit, Mich., for the petitioner. A. J. Friedman, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: This proceeding involves tax deficiencies for the calendar year 1941 as follows: Income Tax
$1,497.72
Declared Value Excess Profits Tax
1,253.20
Excess Profits Tax
3,506.36
In addition to one other adjustment, which is not contested, respondent determined that the salary paid to each of petitioner's four officers during the taxable year 1941 was in excess of a reasonable allowance for compensation for services rendered. The correctness of that action is the sole issue presented. The case was submitted upon a stipulation of facts with exhibits attached and upon evidence adduced at the hearing. The facts stipulated *178 are so found. Findings of Fact Petitioner is a corporation organized in 1933 under the provisions of Act No. 12 of the Public Act of Michigan of 1869, section 21.871 of Michigan Statutes Annotated. Petitioner's principal place of business is in the City of Flint, Michigan. Its corporation income tax, declared value excess profits tax and excess profits tax returns for the calendar year 1941 were prepared on a cash basis and filed with the collector of internal revenue for the district of Michigan. Since petitioner's organization, its corporate activity has been confined to the ownership, operation and maintenance of a rural cemetery, known as Flint Memorial Park. At the close of 1940 the cemetery covered 49 acres, which provided room for about 29,000 graves. In 1941 32 additional acres were purchased making space in the entire cemetery for 50,000 graves. At the close of 1940 the cemetery had been surveyed and landscaped, and was fully developed. An administration building and a maintenance building were on the property, the former being used as cemetery resident offices and as the home of a superintendent. The maintenance building housed the burial and general maintenance equipment *179 which was owned and used by petitioner. Petitioner's income is derived principally from the sale of cemetery lots, many of which are paid for on the installment basis, from the opening and closing of graves, and from the general care thereof. Its sales, collections and net income for the years 1938 to 1941, inclusive, are as follows: Year
Sales
Collection
Net Income
1938
$105,758.00
$26,143.76
$ 2,450.13
1939
150,234.75
47,103.45
217.14
1940
122,647.50
59,641.72
2,583.71
1941
113,072.50
83,550.83
13,951.49 At the close of 1941, there was no mortgage or other lien upon petitioner's property, although each of petitioner's officers held its notes for money loaned. Petitioner's paid-in capital at the organization of the company and during 1941 was $20,000, with 2,000 shares of stock outstanding. During 1941 petitioner's officers, stockholders and the number of shares of stock owned by each were as follows: Samuel Kurtz, President
500 Shares
Anna Kurtz, Vice-President
500 Shares
E. J. Salzinger, Vice-President
500 Shares
Leo W. Tobin, Sec'tary-Treasurer
500 Shares
Total
2,000 Shares
No dividends were paid by petitioner *180 to its stockholders in the year 1941 or prior thereto. The salaries paid to petitioner's officers during the years 1935 to 1941, inclusive, are as follows: Samuel
Anna
E. J.
Leo W.
Year
Kurtz
Kurtz
Salzinger
Tobin
1935
$ 3,900
$1,300
$1,300
1936
3,900
1,300
1,300
1937
3,900
1,300
1,300
1938
3,900
1,300
$1,075
1,300
1939
6,500
2,600
2,600
2,600
1940
9,100
2,600
2,600
2,600
1941
11,700
5,200
5,200
5,200
Payment of the 1941 salaries was authorized by resolution of petitioner's board of directors at a regular meeting held on March 21, 1941. In addition each of the officers received payments from petitioner as interest on its notes which they held. Sumuel Kurtz was one of the organizers of petitioner and served as its president from 1933 through 1941. During and prior to 1941 he acted as general operations manager, sales manager and salesman. With the advice of the secretary-treasurer, he designed the cemetery landscaping, developed the sales policy, and established practices to build good will. A policy was established that cemetery lots should be sold only to persons having need therefor; this was done to *181 prevent speculation in the lots. A policy of setting aside sections of the cemetery for members of certain fraternal organizations was also developed. Among measures adopted to establish good will were the installation of chimes, and the prohibition of grave markers rising above grass level. Kurtz directed the work of the superintendent, and supervised landscaping and construction. During 1941 he also supervised six salesmen, two less than petitioner employed during 1940, and made sales himself. During his vacation Kurtz visited other cemeteries in search of ideas to improve Flint Memorial Park. Kurtz worked about 9 a.m. to 5 p.m. on each day of the week except Sunday when he worked from noon until evening. On an average of five nights per week during 1941 Kurtz, accompanied by Anna Kurtz, his wife and vice-president of petitioner, called on prospective lot purchasers and those who were delinquent in installment payments. Kurtz did not receive a commission on any sales which he made and received no percentage on sales made by the men under his supervision. The salary received by Kurtz in 1941 is reasonable compensation for services rendered by him to petitioner in that year. Anna *182 Kurtz had charge of the reinstatement of delinquent accounts. This consisted of interviewing such delinquents and persuading them to bring their accounts up to date and to continue payments thereon. During 1941 some $77,000 in such accounts were reinstated which was more than the reinstatements of prior years. Mrs. Kurtz employed a full time maid during 1940 and 1941 to take care of her housekeeping and her 14-year old daughter. Mrs. Kurtz began her duties for petitioner at noon on each day of the week including Sunday and she worked until evening. On an average of five nights a week during 1941 she went with Mr. Kurtz to interview prospective customers and to attempt reinstatement of delinquent accounts. Reasonable compensation for services rendered by Mrs. Kurtz to petitioner in 1941 is $4,000. E. J. Salzinger, vice-president, was not a full time employee of petitioner. He spent some time at the cemetery on Saturdays and Sundays. He also substituted for the president whenever he was needed, talked with some of the prospective customers who visited the cemetery on week-ends, and was some times sent by the president to purchase supplies. Leo W. Tobin, secretary-treasurer of petitioner, *183 was also employed as production manager of A. C. Spark Plug Division of General Motors, for which he was paid $15,612 in 1941. In this position, which he had held for many years, Tobin worked only two or three hours in the morning and two or three hours in the afternoon, and he was thus able to spend whatever time was necessary in the fulfillment of his duties for petitioner. His functions for petitioner were to sign checks and advise and consult with Mr. Kurtz in developing the sales and financial policies of petitioner. He enjoyed a good reputation in Flint, and this reputation and his social contacts were considered to be productive of business for petitioner. In its tax returns for 1941 petitioner deducted the full amounts paid to its officers as salary during that year. Respondent disallowed as excessive $2,600 of the salary of each of the four officers, bringing the total disallowed deductions for salaries to $10,400 and reducing the allowed deductions for salaries for 1941 to the same amounts as were paid by petitioner in 1940. Opinion In support of its contention that the salary paid to each of its officers in 1941 was reasonable compensation for services rendered, petitioner *184 points to the purchase of additional land in that year for cemetery use, to the services rendered by each of the officers and to the testimony of its expert witness. Respondent has requested an ultimate finding of fact that the payments in controversy constitute a payment of dividends from corporate profits. We think that on the facts petitioner is required to present unusually clear and convincing evidence to meet its burden of proof. Petitioner's officers were equal owners of all its outstanding stock and the salary increases in the taxable year were exactly equal. The corporation paid no dividends in this year, although its net profit after salaries was more than four times what it had been in any year of which we are aware. Petitioner has never paid any dividends as such, and its net profit in past years had not exceeded $3,000 per year. Under such circumstances the action of petitioner's directors in fixing the salaries has little force in overcoming the presumption in support of respondent's determination. Cf. . Petitioner has suggested that the 1941 increases in the officers' salaries were justified *185 because increased business and the purchase of additional land added to the problem of the officers. We are given no figures, however, as to the number of burials in the cemetery in any year. Collections increased in 1941 some $24,000 over those of 1940 but sales were reduced by about $9,500. We are not told how or to what extent the increase in collections caused or was the result of greater effort on the part of any of the officers. Nor is there any specification of the problems resulting from the purchase of the land. The record is entirely consistent with a conclusion that negotiations for the purchase were completed in 1940 and that petitioner did nothing more with respect to the land in 1941 than to take title to it. There is no testimony to the effect that any officer expended more time in petitioner's interest in 1941 than in any prior year. On such a record, we find in petitioner's 1941 activities only the increased revenues as a reasonable explanation of the salary increases of that year, which tends to support respondent's contention that the increases were, in fact, a distribution of profits rather than compensation for services rendered. . *186 Petitioner points out, however, that the 1941 salaries were authorized at a directors' meeting held on March 21 of that year, when the success of the year's operations could not yet be determined. It is contended that the officers were not adequately compensated in years prior to 1941 and that the 1941 salaries were reasonable compensation for services actually rendered in that year. Petitioner's expert witness, Jones, without specifying comparable salaries in comparable situations, testified generally that the officers were not overpaid in 1941. Such testimony, while not conclusive, may be considered along with other pertinent facts. . We have found that the salary paid to Samuel Kurtz in 1941 was reasonable compensation for services rendered. He was the dominant figure in the establishment and development of the cemetery and he gave it his constant attention from its organization in 1933 to and including 1941. His loyalty and special skill so developed were entitled to considerable weight in fixing his annual salary. . Only he of all *187 the officers was on duty and present during all business hours. He was responsible for most of its policy, supervised all of its operations and personnel. He was president, operations manager, sales manager, salesman, designer and supervisor of construction and landscaping. We think that his salary in 1941 was not excessive. As vice-president, Mrs. Kurtz performed services which may justifiably be regarded as those of a regular employee. She was on duty at stated periods and was charged with the particular duty of interviewing delinquent installment debtors in the hope of reinstating their accounts. Such reinstatements in 1941 totalled $77,000, representing an accomplishment which, in our view, is entitled to substantial reward. This was apparently her sole function, however, and we think petitioner has failed to correlate that service with the salary paid. In view of all the evidence, we have concluded and found that $4,000 was reasonable compensation for Mrs. Kurtz's services to petitioner in the taxable year. We think that respondent has allowed petitioner a reasonable deduction for compensation of officers Salzinger *188 and Tobin. Their services were rendered only when needed, and the record is devoid of evidence as to the extent of such need. The expert testimony here given does not cure that deficiency. The nature of these officers' duties is clear but we find therein no basis for concluding that $2,600 was less than a reasonable allowance for the work done by each in 1941. Cf. , reversed on other issues, . As to vice-president Salzinger, it appears that respondent has been generous, for the evidence only shows that he performed some service and was available for more. As secretary-treasurer of petitioner, Tobin signed its checks. He also made available to petitioner his business experience and acumen and his good name in the community. We have no doubt that petitioner benefited from his association with it in an executive capacity, but we can not conclude from the evidence that $2,600 was less than the value of such benefit in 1941. Respondent's action with respect to each of these two officers is accordingly sustained. Decision will be entered under Rule 50.